**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza*
*New York, New York 10278*

June 5, 2026

**BY ECF**

The Honorable Denise L. Cote
United States District Judge
Southern District of New York
New York, New York 10007

> Re:   *United States v. Benjamin Taylor,* **18 Cr. 184 (DLC)**

Dear Judge Cote:

The Government respectfully submits this letter in advance of the June 11, 2026 plea and sentencing proceeding for defendant Benjamin Taylor to assist the Court in determining a just and fair punishment.

Taylor participated in a highly-profitable insider trading ring and he did so for years. Taylor betrayed his clients and employer, repeatedly sold confidences for cash, and he encouraged his then-girlfriend to do the same. Evaluated alone, Taylor's brazen and persistent criminal conduct would warrant serious punishment. On the other side of the ledger, however, Taylor arrives before the Court under unusual personal circumstances: he settled with the Securities and Exchange Commission and he has voluntarily chosen to travel to the United States to accept the Court's punishment, even though he previously defeated the Government's efforts to extradite him. Taylor's recent choices distinguish him from most other insider trading defendants and weigh heavily in favor of leniency.

Balancing all of the circumstances, the Government respectfully contends that a substantially below Guidelines sentence of six months' imprisonment would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. The defendant urges the Court to impose a time-served sentence, underscoring the defendant's acceptance of responsibility, personal growth, and family responsibilities. *See* Benjamin Taylor Sentencing Memorandum ("Taylor Mem."), ECF Doc. 70. Taylor makes fair points. Compared to a time-served sentence, however, a custodial sentence will ensure both that Taylor is credited for his remarkable acceptance of responsibility and that this prosecution contributes to general deterrence.

Hon. Denise L. Cote                                                                                      Page 2
June 5, 2026

**I.      Background**

**A.  The Insider Trading Scheme**

For more than half a decade, Taylor participated in an organized insider trading scheme for his personal benefit. Taylor personally misappropriated confidential information from his investment bank employer and he also encouraged and directed his then-girlfriend Darina Windsor to do the same from her employer. Taylor used the information he gathered to share approximately fifteen tips regarding U.S. exchange-traded companies, principally to John Dodelande and Kevin Dodelande. John and Kevin Dodelande in turn, tipped various traders. Armed with Taylor's tips, these traders profited by tens of millions of dollars from these trades. The traders kicked back millions to the Dodelande brothers, and the brothers then compensated Taylor with more than $1 million in cash payments and gifts.

*Taylor's Theft of MNPI from Investment Bank A*

Taylor was employed in Investment Bank A's London office from 2010 to 2014 as an analyst. During the course of his work at Investment Bank A, Taylor regularly had access to material nonpublic information ("MNPI") about the bank's clients, including confidential documents relating to potential corporate acquisitions and capital markets activities.

Taylor knew and understood he had duty to keep nonpublic information confidential. As part of his work for Investment Bank A, Taylor signed an employment agreement, effective February 15, 2010, in which he agreed that he "shall in perpetuity, maintain in confidence and shall not directly, indirectly or otherwise, use, disseminate, disclose or publish, or use for [Taylor's] benefit or for the benefit of any person, firm, corporation or other entity any confidential or proprietary information or trade secrets of or relating to [Investment Bank A] (including . . . information with respect to [Investment Bank A's] clients." In addition, during the time of his employment with Investment Bank A, Taylor also agreed and acknowledged, among other things, that: (a) he owed a fiduciary duty to Investment Bank A; (b) he would hold all confidential information learned in the course of his employment in strict confidence; (c) he would not disclose such information to anyone outside of Investment Bank A, or use or permit any third party to use such information, except as required in the performance of his job; and (d) he was prohibited from trading or tipping others to trade securities based on his knowledge of the current or contemplated activities of Investment Bank A, any of its clients or prospective clients. For example, on March 18, 2013, Taylor affirmed that he would not divulge to any person, except in the proper course of his duties to Investment Bank A, any confidential information, which "includes all information, written or oral, relating to [Investment Bank A] and its business, the business of any of its clients and potential clients or our or their counterparties."

In about 2012, Taylor met John Dodelande while on vacation. The two struck up a friendship and they continued to socialize after the vacation ended, periodically meeting up in Paris or London in the months that followed. At some point in 2012, Taylor began hinting at the possibility of providing John Dodelande with information about upcoming mergers and acquisitions. Nothing came of the idea immediately. Eventually, however, Marc Demane Debih approached John Dodelande to ask whether he knew anyone in investment banking with access to nonpublic information. Dodelande decided to link Taylor, the willing tipper, with Deman Debih,

Hon. Denise L. Cote                                                                    Page 3
June 5, 2026

the eager trader. Dodelande did not introduce the two to one another but instead served as middleman. In one early episode, Taylor provided a tip to Dodelande who then passed it to Demane Debih; Demane Debih questioned the veracity of the tip to Dodelande. Upon hearing of the trader's doubts, Taylor then provided actual documents from Investment Bank A to Dodelande to substantiate the tip and Dodelande, in turn, passed them to Demane Debih.

The arrangement between Taylor, John Dodelande, and Demane Debih continued until 2015 or so. At times, Taylor purposefully sought out and accessed MNPI at his work for the sole purpose of furthering the insider trading scheme. For example, Taylor accessed computer files for at least two deals that he was not working on, which included transactions involving (a) Reliance Steel & Aluminum Co. ("Reliance Steel") in connection with its proposed acquisition of Metals USA Holdings Corp. ("Metals"), and (b) Life Technologies Corporation ("Life Technologies") in connection with a proposed sale of the company, and then passed the information he obtained to John Dodelande. John Dodelande then passed the MNPI to various securities traders.

In time, the scheme also expanded to include John Dodelande's brother, Kevin. At some point in 2013, Kevin Dodelande noticed that John Dodelande and Taylor suddenly seemed to be living more luxurious lives than they had before. Eventually Kevin Dodelande inquired of John Dodelande and, later, of Taylor, and learned about the insider trading scheme. In one conversation with Kevin Dodelande, Taylor explained that he and John Dodelande used burner phones and took payments in cash in order to avoid being caught. Kevin Dodelande offered to help with the scheme and Taylor suggested he recruit an additional trader to further monetize the information that Taylor gathered. Kevin Dodelande eventually found a trader interested in inside information, Joseph El-Khouri, and John Dodelande, Kevin Dodelande, and Taylor agreed to split payments Kevin Dodelande received from El-Khouri. Taylor thereafter supplied tips to Kevin Dodelande, Kevin Dodelande passed them to El-Khouri, and El-Khouri kicked back a portion of the profits.

*Taylor's and Darina Windsor's Theft of MNPI from Investment Bank B*

In addition to accessing files from Investment Bank A, Taylor also obtained MNPI from his girlfriend at the time, Darina Windsor.

In or about September 2012, Darina Windsor who had previously been employed at Investment Bank A, began employment at the London office of Investment Bank B. Between 2012 and 2016, when Investment B terminated Darina Windsor's employment, Darina Windsor repeatedly misappropriated MNPI about corporate transactions that Investment Bank B's clients were contemplating. At Taylor's request and with his encouragement, Darina Windsor passed that stolen MNPI to Taylor, who in turn passed it to John Dodelande and Kevin Dodelande.

As part of the scheme, Darina Windsor—like Taylor had done at Investment Bank A—sought out MNPI in order to generate tips. Darina Windsor accessed confidential documents on the computer systems of Investment Bank B relating to the following companies around the time of the securities trading alleged in the superseding indictment: ABC (February and March 2013), Heidrick (April and May 2013), Idenix (May and June 2014), Pharmacyclics (March 2015), Receptos (March and April 2015), Solera (August and September 2015), and Johnson Controls relating to its proposed acquisition of EnerSys (September and October 2015). Except for the ABC

Hon. Denise L. Cote                                                                                          Page 4
June 5, 2026

transaction, Darina Windsor was not involved in those transactions as part of Darina Windsor's employment at Investment Bank B.

Windsor's information allowed Taylor (and others) to consistently make profitable trades, but it eventually drew attention. In 2016, foreign law enforcement executed a search of Darina Windsor's residence and Investment Bank B terminated Darina Windsor's employment. Taylor heard from Darina Windsor that investigators had inquired about Darina Windsor's relationship with Taylor.

In the months that followed the search of Windsor's residence, Taylor resumed providing stock tips to Kevin Dodelande, though Taylor refused to describe to him the source of the information. The Dodelandes continued to pay Taylor for his past tips until at least mid-2018.

### B. Procedural History

On June 13, 2018, a grand jury in this District returned Indictment S4 18 Cr. 184 (DLC), which charged Taylor in forty counts:

Count 1: conspiracy to commit securities fraud and fraud in connection with a tender offer, in violation of 18 U.S.C. § 371;

Count 2: conspiracy to commit wire fraud and securities fraud, in violation of 18 U.S.C. § 1349;

Counts 3 through 18: securities fraud in connection with insider trading, in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 CFR §§ 240.10b-5 & 240.10b5-2; 18 USC § 2;

Counts 19 through 23: fraud in connection with tender offers, in violation of 15 U.S.C. §§ 78n(e) & 78ff; 17 CFR §§ 240.14e-3(a) & 240.14e-3(d); and 18 USC § 2;

Counts 24 through 39: wire fraud, in violation of 18 U.S.C. §§ 1349 and 2; and

Count 40: securities fraud, in violation of 18 U.S.C §§ 1348 and 2.

In September 2018, acting on a provisional arrest warrant application from the U.S. Department of Justice, authorities in the Principality of Monaco arrested Taylor. Taylor was initially detained in connection with the charges. The United States sought Taylor's extradition so that he could stand trial in this District, but Monaco denied the extradition request and released Taylor after fifty-seven days in custody. Taylor then returned to France, where he holds citizenship. In recognition that France will not extradite its own citizens, the Government has not sought to extradite him from France.

Hon. Denise L. Cote                                                                                     Page 5
June 5, 2026

### C. Plea Agreement and Guidelines

In 2025, counsel for Taylor contacted the Government about the possibility of accepting responsibility for the charges in the criminal case.[1] The parties ultimately executed a plea agreement (the "Plea Agreement") on January 14, 2026. In the Plea Agreement, Taylor agreed to plead guilty to Count One of the Indictment—the conspiracy count—and to admit to the core allegations in the Indictment and to acknowledge that he "stole material nonpublic information from his employer and provided that information to co-conspirators so they could execute timely, profitable securities transactions based on the information he supplied." Plea Agreement at 2. For its part, the Government agreed not to seek a sentence of more than a year and a day and to not seek the imposition of a fine.

As outlined in the Plea Agreement, the parties calculate the Guidelines as follows:

1.   The Guidelines Manual in effect as of November 1, 2025 applies to this offense conduct.

2.   The applicable guidelines to the offenses charged in Counts One and Two is U.S.S.G. § 2B1.4.

3.   Pursuant to U.S.S.G § 2B1.4(a), the base offense level is 8.

4.   Pursuant to U.S.S.G §§ 2B1.4(b)(1) and 2B1.1(b)(1)(I), 14 levels are added because the gain resulting from the offense and related conduct was more than $550,000 but less than $1,500,000.

5.   Pursuant to U.S.S.G. §§ 3B1.3 and 2B1.4, Application Note 2, because the defendant occupied and abused a position of special trust in a manner that significantly facilitated the commission or concealment of the offense, 2 levels are added.

6.   Pursuant to U.S.S.G. § 4C1.1(a), the offense level is decreased by 2 levels because, based upon the information now available to this Office (including representations by the defense), the defendant meets all of the criteria in that section.

7.   Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea

---

[1] The Government acknowledges that Taylor, through counsel, had earlier offered to assist the United States in connection with further prosecutions, including the prosecution of Joseph El-Khouri. *See* Taylor Sentencing Letter at 18-19.

of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties' calculation produces an applicable Guidelines offense level of 19. The defendant has zero criminal history points and is in Criminal History Category I. Accordingly, the Guidelines range applicable to the defendant's conviction is 30 to 37 months' imprisonment and a $10,000 to $100,000 fine.

### D. SEC Settlement

In 2019, the Securities and Exchange Commission filed a civil action against Taylor and Windsor, *SEC v. Taylor*, 19 Civ. 9744 (JLR). In February 2026, Taylor finalized a resolution with the SEC and agreed to disgorge $500,000.

## II.    Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## III.    Discussion

A sentence of six months' imprisonment would reflect the nature and seriousness of the offense, ensure just punishment, afford adequate general and specific deterrence to future insider

trading, and avoid unwarranted sentencing disparities. Such a term of imprisonment would balance the punitive and retributive sentencing factors against the defendant's extraordinary acceptance of responsibility and other mitigating personal circumstances.

> ### A. *A Six-Month Sentence Is Necessary Because of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense.*

The nature and circumstances of the offense and need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, counsel in favor of a sentence of six months' imprisonment. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A).

"The integrity of the American stock market, and our securities markets generally, are important to our nation[.]" *United States v. Lavidas*, 19 Cr. 716 (DLC) (July 2, 2020), Sent'g Tr. at 57. Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets to the extent they are abused by well-connected individuals who are willing to exploit an unfair informational advantage and share it with their associates. *See United States v. Collins*, No. 18 Cr. 567 (VSB) (Jan. 17, 2020), Sent'g Tr. at 87-88 (Insider trading "creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell.").[2] Insider trading also "appropriate[s] some part of the returns … at the expense of other shareholders" and "tends to discourage corporate investment and reduce the economic efficiency of corporate behavior." Michael Manove, *The Harm From Insider Trading and Informed Speculation*, The Quarterly Journal of Economics (Nov. 1989). Because of the economic harm caused by insider trading, and because "[o]ur markets are … such an important part of the fabric of our economic life," it is important to "punish those who would hurt the integrity of that system." *United States v. Wong*, No. 22 Cr. 395 (ER) (Jan. 26, 2024), Sent'g Tr. at 24. In short, the serious nature of the harm of insider trading merits serious punishment.

Here, Taylor's degree of planning and commitment to the scheme place his conduct among the more serious insider trading schemes that the Court will encounter. Taylor—a well-educated, well-trained investment banker—knowingly participated in an elaborate insider trading scheme for years. Taylor's participation was enthusiastic: he recruited others to join him, including his

---

[2] *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044, ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, *A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading*, Remarks of Chairman Arthur Levitt, U.S. Sec. & Exch. Comm'n, "S.E.C. Speaks" Conference, Washington, D.C., Feb. 27, 1998 ("The American people see it, bluntly, as a form of cheating.").

own girlfriend, and purposefully sought out information intending to use it for illegal tips. Taylor also structured his involvement in a way to shield himself from discovery, such as by using burner phones, encrypted applications, and cash payments, and by having others place the trades based on his information, reflecting his contemporaneous awareness that what he was doing was wrong. And Taylor continued to supply tips to the Dodelande brothers even after Windsor had been fired from her job and searched by law enforcement, underscoring Taylor's commitment to the scheme.

**B.  *A Term of Imprisonment Is Necessary for Deterrence.***

A term of incarceration is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).

The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 382, 3259); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense). As the *Martin* Court noted: "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *Martin*, 455 F.3d at 1240 (citation omitted); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks and citation omitted).

For these reasons, it is important to impose a sentence that will deter future insider trading. As Judge Rakoff has recognized, non-incarceratory sentences "totally fail to send this message." *Gupta*, 904 F. Supp. 2d at 355. Taylor points to his time in custody in Monaco as sufficient to achieve this aim. Taylor Mem. 40. But it is not all clear that the public—and those who might consider trading on inside information—will take away from Taylor's detention in Monaco that he was punished for insider trading as opposed to the lesson that fighting extradition can succeed. Additional months of imprisonment are required to drive home the lesson that "when you get caught, you will go to jail." 904 F. Supp. 2d at 355. The public value of this message endures even when, as here, the conduct occurred years ago because it associates insider trading with custodial punishment. Moreover, strong deterrence is especially important in dealing with international schemes, such as this one, where the message needs to be received across the global financial community.

Section 3553(a) also requires consideration of specific deterrence, but the Government agrees with the defendant that this factor does not weigh in favor of a lengthy sentence. The defendant's post-arrest conduct, his SEC settlement, his commendable commitment to his family, and the defendant's voluntary return to the United States strongly signal that the need for individual deterrence is low and should not factor meaningfully into the Court's sentence.

### C.  *A Term of Imprisonment is Necessary to Avoid Unwarranted Sentencing Disparities*

"In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). "[S]ection 3553(a)(6) requires a district court to consider *nationwide* sentence disparities." *Id.* (emphasis added). As the Second Circuit has repeatedly observed, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007). "Because § 3553(a)(6) is only one of the several factors that a district court must balance, 'a district court's identification of disparity does not necessarily require it to adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable . . . much less compel any particular reduction.'" *United States v. Goberdhan*, 499 F. App'x 63, 66 (2d Cir. 2012) (quoting *United States v. Florez*, 447 F.3d 145, 157-58 (2d Cir. 2006)).

Here, when comparing the defendant's case to other insider trading defendants across this District, the need to avoid unwarranted sentencing disparities weighs in favor of imposing a below Guidelines sentence, but with some term of incarceration. Taylor invites the Court to consider various below-Guidelines sentences in arguing that a time-served sentence is sufficient. *E.g.* Taylor Mem. 30-36. While it is true that two months' incarceration would not be unheard of for an insider trading case, a six-month sentence would more comfortably fit within the range of outcomes in other insider trading cases. Indeed, a six-month sentence would fall significantly below many sentences imposed on defendants who accepted responsibility through guilty pleas. *See, e.g.*, *United States v. Yedid*, 25 Cr. 248 (LTS) (defendant sentenced to 15 months' imprisonment after pre-indictment guilty plea); *United States v. Wahi*, No. 22 Cr. 392 (LAP) (defendant sentenced to 24 months' imprisonment after guilty plea); *United States v. Kakkera*, No. 22 Cr. 398 (GHW) (defendants sentenced to 18 months' imprisonment after guilty plea); *United States v. Markin*, No. 22 Cr. 395 (ER) (defendant sentenced to 15 months' imprisonment after guilty plea); *United States v. Buyer*, No. 22 Cr. 397 (RMB) (defendant sentenced to 22 months' imprisonment after trial); *United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant sentenced to 28 months' imprisonment after guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment after guilty plea); *United States v. Dikshit*, No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment after guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant sentenced to 33 months' imprisonment after pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment after guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment after guilty plea).

The Government acknowledges that the Court should, in fairness, also give significant consideration to the sentences imposed on others implicated in this same scheme. The Government

Hon. Denise L. Cote                                                                                      Page 10
June 5, 2026

deferred prosecution of Darina Windsor, Taylor's former girlfriend and co-conspirator, and thus she is unlikely to incur a criminal conviction or face jail time. The Government also extended non-prosecution agreements to John Dodelande and Kevin Dodelande, individuals who profited far more than Taylor from the scheme, and who will not serve a term of imprisonment, either. Finally, the Court imposed a time-served sentence on Demane Debih, one of the traders. The circumstances of these defendants vary: Windsor is substantially less culpable than Taylor. Demane Debih had been detained for fifteen months, including in a Serbian jail, and testified as a cooperating witness. John Dodelande and Kevin Dodelande are at least equally culpable to Taylor, and arguably more culpable, but they acknowledged their conduct and assisted the Government years before Taylor came forward to plead guilty. The fact that neither Dodelande will face imprisonment weighs against a lengthy term of incarceration. It does not, however, render a sentence of six months' imprisonment disproportionate or unfair.

## IV.       Fines, Forfeiture, and Restitution

Consistent with the Plea Agreement, the Government seeks an order forfeiting Taylor's illicit proceeds, totaling approximately $1.2 million. As set forth in the proposed consent preliminary order of forfeiture, the Government will accept $510,000 in satisfaction of the entire forfeiture amount, if paid promptly, and will credit Taylor for payments made to the SEC against the outstanding balance. (A proposed consent preliminary order of forfeiture is attached hereto as Exhibit A.) As set forth in the Plea Agreement, the Government does not seek the imposition of a fine.

Counsel for Investment Bank A has indicated that it may seek restitution. As of today, the Government has not received any records from Investment Bank A to substantiate a claim to restitution. Should the Government receive any materials prior to the sentencing proceeding, the Government will provide them to the Court and the defendant.

## V.        CONCLUSION

Benjamin Taylor has made the commendable decision to accept responsibility for his role in a criminal insider trading ring. In light of all the circumstances, the Government respectfully submits that a sentence of six months' imprisonment would be sufficient but not greater than necessary to achieve the purposes of sentencing. For the reasons discussed above, such a sentence would promote respect for the law, achieve general deterrence, and avoid unwarranted sentencing disparities.

Hon. Denise L. Cote                                                        Page 11
June 5, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

Andrew Thomas
Assistant United States Attorney
(212) 637-2106